IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

NICHOLAS L. VASSENELLI,

                              Plaintiff,

                                                    Civ. Action No.
          v.                                        5:10-CV-1422 (DNH/DEP)


THE CITY OF SYRACUSE, *et al.,*

                              Defendants.

_____

APPEARANCES:                                OF COUNSEL:

FOR PLAINTIFF:

BOSMAN LAW FIRM, L.L.C.            A.J. BOSMAN, ESQ.
6599 Martin Street                BETH A. LOCKHART, ESQ.
Rome, NY  13440

FOR CITY DEFENDANTS:

COUGHLIN, GERHART LAW FIRM     MARY LOUISE CONROW, ESQ.
19 Chenango St.
P.O. Box 2039
Binghamton, NY 13902-2039

HON. MARYANNE DOUGHERTY        SHANNON T. O'CONNOR
CITY OF SYRACUSE               Assistant Corporation Counsel
CORPORATION COUNSEL
233 E. Washington Street
300 City Hall
Syracuse, NY 13202

FOR POMCO DEFENDANTS:

HISCOCK BARCLAY LAW FIRM          ROBERT A. BARRER, ESQ.
One Park Place
300 South Salina Street
Syracuse, NY 13202-2078

FOR DEFENDANT ERIKSSON:

BRADY, CARAFA LAW FIRM          JAMES C. BRADY, ESQ.
443 Electronics Pkwy.
Liverpool, NY 13088

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff Nicholas L. Vassenelli, a retired disabled police officer

formerly employed by defendant City of Syracuse ("City"), brings this

action against the City and several present and past City employees as

well as POMCO Group a/k/a POMCO, Inc., ("POMCO"), a third-party

benefits administrator for the City, and a POMCO employee, asserting

various federal and state law causes of action arising out of the City's

payment of benefits to the plaintiff under New York General Municipal Law

§ 207-c.  In his complaint, as amended and supplemented, plaintiff alleges

that for various reasons, including a change in policy in or about

September 2009 concerning the payment of such benefits, the City has

failed to provided him with adequate and proper medical treatment and

hospital care as guaranteed under section 207-c.

Precipitated mainly by his belief that the City intended to forcibly remove him from his home without his consent and place him in an assisted care facility – a fear which neither was grounded in reality nor ultimately came to fruition – in August 2011 plaintiff moved for a preliminary injunction.  In his motion, plaintiff has requested an order prohibiting the defendants from removing him from his home and requiring defendants to provide him with all necessary medical treatment and services, with monitoring by a special master to insure compliance. Because I find that plaintiff has established neither a likelihood of success on the merits of his claims, nor that he will suffer irreparable harm absent the issuance of injunctive relief, I recommend that his motion be denied. The following represents my recommended findings of fact and conclusions of law regarding plaintiff's motion.

I.      BACKGROUND

Plaintiff, who is currently fifty-two years old, joined the Syracuse City Police Department as a police officer in 1986 and in 1989 was promoted to the position of detective.  Hearing Transcript ("Tr.") 34-35; *see also* Exh. P-FF.  After joining the force, plaintiff was employed by the Syracuse City Police Department until his retirement in 2006.  Tr. 34-36.  Vassenelli

3

currently resides in Cicero, New York.  Tr. 42.

In October of 2003, plaintiff was injured while playing racquetball in a police department facility, suffering a debilitating C3-C4 spinal cord injury which caused severe and permanent partial paralysis.  Tr. 35, 204, 516; *see also* Exh. P-FF.  At the outset, plaintiff was completely paralyzed as a result of his injury, though he has since recovered the use of a portion of his left side and approximately ten percent use of his right side. Tr. 35.  Plaintiff experiences spasticity predominantly on the right side and in both legs, and suffers from paralysis in both arms and legs, also predominantly on his right side.  Tr. 135-36.

As a result of his injuries plaintiff ambulates only with the assistance of a rolling walker and a custom wheelchair and requires around-the-clock home health care assistance.  Tr. 40.  Plaintiff has an implanted intrathecal Baclofen pump which provides him with medication to control spasms, as well as Oxytol patches, which must be periodically changed, to control bladder spasms.  Tr. 38, 113-15; Exhs. D-27, P-FF.  Plaintiff's medical treatment is overseen by Dr. Jeffrey Christenson, a family practitioner, and Dr. Claudine Ward, a specialist in the field of physical medicine and rehabilitation, with an emphasis on brain injuries.  Tr. 83, 135, 202-05; Exh. P-CC.  Plaintiff also treats monthly with a psychologist,

4

Dr. Spinks, whose services have been sought due to a confluence of circumstances, including not only his injuries and issues associated with the resulting disability, but other unrelated stressors in his life as well.  Tr. 115, 117, 231.  In addition, plaintiff participates in weekly mental health counseling sessions.  Tr. 118, 231.  Plaintiff has seen Drs. Christenson, Ward, and Spinks at the City's expense, with no interruption in treatment.[1] Tr. 230-31.

As a result of his injuries plaintiff was forced to accept a disability retirement from the police force in June of 2006; he now receives retirement benefits equaling approximately one-half of his former salary as a police officer as well as social security disability payments.  Tr. 34, 41, 261.  In addition, because his injury was deemed to be work-related by the City, plaintiff is also receiving benefits from the City under New York General Municipal Law ("GML") § 207-c.[2]  Tr. 35.

Defendant City of Syracuse is a municipal corporation operating under the laws of the State of New York.  The City is self-insured for

---

[1]      All of the bills submitted by Dr. Christenson and Dr. Ward for care and treatment of the plaintiff have been paid by the City.  While Dr. Christenson initially would not accept payments from the City at prescribed workers' compensation rates, the City was able to successfully negotiate a payment rate with that doctor's office for services rendered to the plaintiff.  Tr. 566.

[2]      Plaintiff also receives secondary health insurance benefits through the City for medical care not related his worked-related injury.  Tr. 40-41.

purposes of fulfilling its obligations under GML § 207-c.  Tr. 396, 570.  It

does not provide workers' compensation benefits to police officers.  Tr.

570.  Section 207-c requires the City to pay for all of medical treatment

and hospital care necessary by reason of plaintiff's work-related injury.[3]

The determination of whether or not a particular expense should be

processed for payment under section 207-c rests in the first instance with

_____

[3]         Under this provision, any member of any city police force

who is injured in the performance of his duties or who is
taken sick as a result of the performance of his duties so as
to necessitate medical or other lawful remedial treatment
shall be paid by the municipality . . . by which he is
employed the full amount of his regular salary or wages
from such employer until his disability arising therefrom has
ceased, and, in addition such municipality . . . shall be liable
for all medical treatment and hospital care necessitated by
reason of such injury or illness. . . . Any injured or sick
policeman who shall refuse to accept medical treatment or
hospital care or shall refuse to permit medical inspections
as herein authorized, including examinations pursuant to
subdivision two of this section, shall be deemed to have
waived his rights under this section in respect to expenses
for medical treatment or hospital care rendered and for
salary or wages payable after such refusal.

Notwithstanding any provision of law to the contrary, a
provider of medical treatment or hospital care furnished
pursuant to the provisions of this section shall not collect or
attempt to collect reimbursement for such treatment or care
from any such policeman, a member of a police force of
any county, city, any such advanced ambulance medical
technician or any such detective-investigator or any other
such investigator who is a police officer pursuant to the
provisions of the criminal procedure law.

N. Y. Gen. Mun. Law § 207-c(1).  This provision contemplates that medical providers
will directly bill, and the municipality directly pay, for medical services provided to
disabled policemen.  *See Gentile v. Nulty*, 146 F. Supp. 2d 340 (S.D.N.Y. 2001).

Syracuse Police Sergeant Richard Kevin Perrin and depends upon whether the expense is for treatment that is medically necessary and casually related to the injury resulting in the provision of benefits under section 207-c.  Tr. 554-55, 582.  In the event of a question concerning whether an expense is medically necessary and/or causally related to an employee's workplace injury Sergeant Perrin may reach out to the City's physician, Dr. Brody, or directly contact the employee's treating physician to obtain more information.  Tr. 554-56.  In administering section 207-c benefits, the City has also for years used independent medical examinations ("IME") when needed to assist in determining whether a causal relationship exists between a work-related injury and a medical expense and/or whether such expense is medically necessary.  Tr. 555. The City processes claims for both active and retired police officers in a similar manner.  Tr. 556.

If an employee desires to question the denial of section 207-c benefits he or she may contact Sergeant Perrin to discuss the denial and seek a reversal of his decision.  Tr. 562.  If the officer is not satisfied after discussing the matter with Sergeant Perrin, he or she can challenge the determination by way of a special proceeding commenced in New York State Supreme Court under Article 78 of the New York Civil Practice Law

& Rules ("CPLR").  *See DeMasi v. Beneficio*, 567 F. Supp. 2d 449, 454 (S.D.N.Y. 2008).

Prior to October 2010, payments for plaintiff's medical expenses were processed internally within the City's police department.  Tr. 464, 554-56, 563.  During that period the City's section 207-c program was administered initially by now-retired Sergeant Susan Adams, and later by Sergeant Perrin.  Tr. 387, 554-55.

In October 2010, POMCO, a third-party administrator previously engaged by the City in other matters, was retained to oversee payment of medical benefits for police and fire workers under GML §§ 207-c and 207-a, respectively.[4]  Tr. 460-61, 496; *see also* POMCO Exhs. 3-5.  Defendant Sharon Miller was assigned by POMCO to act as the nurse case manager responsible for administering plaintiff's case.  Tr. 461.  Ms. Miller has been employed with POMCO for twenty-two years and has served as its director of case management for approximately ten of those years.  Tr. 458-59.  The decision to have POMCO assign a case manager to Mr. Vassenelli was made by the City.  Tr. 495-496, 572.  The function of a case manager is to provide information to the City and suggest

---

[4]    Although POMCO manages and administers the workers' compensation program for City employees, it only processes payments for medical benefits for police officers and firefighters.  Tr. 459-61; POMCO Exh. 4 at p. 1.  POMCO is also the third-party administrator for the City's self-insured health insurance program.  Tr. 461.

alternatives in order to permit the City to make determinations about what types and levels of medical care are necessary and appropriate.  Tr. 368, 459.

POMCO currently operates as a consultant for the City pursuant to an agreement entered into on or about April 1, 2008 and initially running through March 31, 2011, and later extended until March 31, 2013. POMCO Exhs. 4 and 5.  Under the terms of that agreement, *inter alia*, POMCO is required to perform "all services required to process the payment of medical benefits pursuant to General Municipal Law (GML) §§ 207-a and 207-c for the City's Fire and Police Departments."  POMCO Exh. 4 at p. 1.  In carrying out its duties under the agreement with the City, POMCO follows the same practice that it does for all other police and fire departments for which it works within New York State.  Tr. 460.

In carrying out its role, POMCO pays medical bills for the City's police and fire workers utilizing either the workers' compensation fee schedule or negotiated rates.  Tr. 459-60.  This is consistent with the City's historical practice of utilizing the workers' compensation fee schedule as a guide for paying benefits under section 207-c.[5]  Tr. 388,

---

[5]     That the City has paid for services on behalf of Vassenelli at workers' compensation scheduled rates, a practice which not only has existed for many years but is consistent with the policies of other municipalities, is legally irrelevant in this case.  There was no evidence adduced at the hearing to show that any care provider

394-96, 563-64, 570.  Indeed, the only evidence that any of plaintiff's
providers has even questioned the City's practice relates to an inquiry
from MedBest Medical Management in October 2011.  *See* Tr. 394, 564.
Exh. D-44.  That inquiry was prompted by plaintiff's attorney, A.J.
Bosman, Esq., who apparently communicated with MedBest asserting that
section 207-c requires full payment of medical bills at the applicable billed
rate and that by paying at a lower, or at the workers' compensation
scheduled rate, the City is in violation of the law.[6]

Significantly, under the parties' agreement, neither Sharon Miller nor
POMCO have final authority with respect to authorization of medical
treatment or other requests in cases, including the plaintiff's; instead, in
her capacity as nurse case manager Ms. Miller only makes
recommendations and insures that plaintiff's authorized care is properly
carried out.  Tr. 461-462, 581-582.

While plaintiff has speculated that POMCO profits by denying
plaintiff medical care, Tr. 263-264, the proof during the hearing did not
bear this out.  The evidence demonstrated only that when POMCO is able

---

has refused treatment or services to Vassenelli as a result of that practice, including
Dr. Christenson who specifically stated his awareness that some of his bills have been
reduced.

    [6]    Not surprisingly, plaintiff has cited no authority to support this contention.

to negotiate a more favorable rate with a provider than under the workers'
compensation schedule it earns a percentage of the savings.  Tr. 482-
484.  POMCO does not, however, recover a percentage of expenses
denied, nor does it earn a percentage of expenses calculated based upon
a differential between the workers' compensation fee schedule and a
higher customary billing rate by a provider.  *See id.*

Over time, plaintiff has been provided with a variety of treatment
services and devices paid for by the City.  Pursuant to section 207-c, in
total, the City has paid in excess of $800,000 to date in connection with
plaintiff's injuries, including all expenses deemed medically necessary and
causally related to his workplace injury.[7]  Conrow Aff. (Dkt. No. 34) ¶ 13
and Exh. A; *see also* Exh. D-1.  Among the services and devices presently
provided at City expense are aqua therapy, Tr. 232; an independent
health program, which essentially constitutes a basic exercise program,
Tr. 244; a customized wheelchair, at a cost of approximately $4,000, Tr.
232, 568, 593; compression stockings – which plaintiff admits he does not
use, Tr. 233-34; pressurized stockings utilizing a pneumatic pump – which

---

[7]        The only evidence adduced even remotely suggesting of lack of payment
of any medically necessary expense concerns plaintiff's allegation that he was not
reimbursed for $45.00 in medical expenses advanced by him.  Tr. 77.  That appears to
have been an isolated incident, however, and plaintiff was unable to remember what
the $45.00 he paid was for, nor could he produce duplicate receipts for the items for
which he sought reimbursement.  Tr. 257-58.

plaintiff also admits not using, Tr. 234; a CPAP machine to address his sleep disorder – another device plaintiff does not use as prescribed, Tr. 234; around-the-clock home health care, Tr. 568; the prescription drug Lyrica, Tr. 184; a Baclofen pump, including regular filling, maintenance, and monitoring, Tr. 113-14, 184; Botox injections to increase mobility in his right hand, Tr. 113; a nurse who comes to plaintiff's home twice weekly to change his Oxytol patch, Tr. 115; and, transportation services to and from medical appointments and certain other travel incidental to his care and treatment, Tr. 110, 569.

In May 2010, the City required that plaintiff undergo an IME administered by Dr. Warren Silverman to assist in monitoring his care.[8] Tr. 557; Exh. D-28.  That IME was arranged consistent with a long-existing practice of the City to use such examinations to review the medical treatment and disability status of both active and retired injured employees.  Tr. 555-56.  Following the IME, on August 4, 2010 the City advised the plaintiff, in writing, through Sergeant Perrin that his massage and aqua therapy programs would no longer be paid for by the City based upon a finding by Dr. Silverman that they were not medically necessary.

---

[8]     That IME was the second administered by Dr. Silverman, the first having taken place on June 12, 2009.  *See* Exh. P-FF.

Tr. 561.  Sergeant Perrin personally delivered the letter to the plaintiff at his home and discussed the matter with him.  *Id.*  After listening to plaintiff describe the benefits of his aqua therapy program, Sergeant Perrin rescinded his decision to terminate aqua therapy, though he adhered to his decision to discontinue the massage therapy.  Tr.  562-63.

Massage therapy has been prescribed for the plaintiff by Dr. Christenson and was noted by Dr. Ward to be an effective treatment to decrease plaintiff's pain.  Tr. 145-46, 160, 169, 170, 172.  Both Dr. Ward and Dr. Christenson testified, however, that plaintiff's condition would not necessarily deteriorate as a result of being denied massage therapy.  Tr. 170, 218.  The City's decision to discontinue the plaintiff's massage therapy was based upon the conclusion that when massages are needed to address plaintiff's pain they can be administered by a home health aide. Tr. 560; Exh. D-28.

Twenty-four hour home health care coverage has been provided for the plaintiff through a variety of sources.  Both prior to and during the first few months of 2009 plaintiff selected his own home health care aides.  Tr. 65.  In or around May or June 2009, after the City learned that the aides then caring for plaintiff did not have proper licensing certifications, it terminated their services and engaged All Metro, a health care agency, to

provide home health care for plaintiff.  Tr. 69, 301.  At the plaintiff's

request, the City later terminated its agreement with All Metro and sought

out a new provider.[9]  Tr. 236-237.  Plaintiff's home care was then

transitioned to oversight first by Sharon Erikson, who was dismissed at

plaintiff's request, and later Tina Hills, who worked in the plaintiff's home

during a portion of 2010 and into 2011, Tr. 465, Exh. P-Z.  Hills' services

were terminated due to the lack of proper certification.  Tr. 86, 571-73.

In or about April of 2011, NurseCore was retained to provide home

health care services to the plaintiff.  Tr. 401.  The relationship with that

company, however, became tenuous in or about June 2011, after plaintiff

made allegations regarding NurseCore aides sleeping while on duty and

failing to perform certain required services, Tr. 237-238, 413-15, and

Shirley Pratt, clinical director for NurseCore, received complaints from

certain aides regarding the plaintiff.  Tr. 409; *see also* Exh. D-43.  In or

about August of 2011, NurseCore ultimately terminated its relationship

with the City for purposes of providing services to the plaintiff, giving the

---

[9]      The services provided to the plaintiff by All Metro proved highly
unsatisfactory.  All Metro staff placed in the home proved incompetent and frequently
created a risk of danger for the plaintiff.  Tr. 276-78.  Assigned All Metro care providers
missed shifts, and as a direct result of their absence plaintiff fell numerous times and
suffered several injuries because of those falls.  Tr. 68-69, 87-88.  In addition, plaintiff
missed several therapy sessions, including at the Institute for Human Performance and
aqua therapy, due to those absences.  Tr. 69.

City only one week's notice.  Tr. 423-24, 467; 469-70; *see also* Exhs. D-14, D-41.  The termination occurred upon mutual agreement of both the plaintiff and the company due to a breakdown in communications between them.  Tr. 237-238, 423-424.

When the relationship with NurseCore ended, the City began a search for a new agency to provide home health care services for the plaintiff in short order.  Tr. 466-467; *see also* D-41.  Various options were explored by the City and POMCO to address the potential inability to secure a new agency, including the possibility of a temporary placement in an assisted living environment.  Tr. 132, 465-66.  At no time did POMCO or the City suggest that plaintiff would be involuntarily placed in such a residential facility without his consent, and the need to pursue the possibility of such a placement, in fact, never arose.  Tr. 254, 466, 575.  The residential placement option was not pursued in light of plaintiff's objection, and instead interim arrangements were made for the provision of home care to the plaintiff, at City expense, by Amanda Davis, an LPN who had previously assisted the plaintiff and of whom he approved.  Tr. 104-05, 318.

After only a very brief hiatus a new agency, Self-Direct, was selected by the plaintiff to serve as his home health care agency and was

15

retained by the City on or about August 20, 2011.  Tr. 238.  Self-Direct

currently provides plaintiff with personal care, safety oversight and

supervision, assistance in attending appointments, preparation of and

assistance with meals, and housekeeping and nursing services, including

for medications and patch changes.  Tr. 336.  Plaintiff is satisfied with the

care he is receiving from Self-Direct, Tr. 298, and Dr. Ward testified that

plaintiff's current home health care situation is "OK".  Tr. 176.

As was previously referenced, plaintiff is also receiving certain

transportation services at City expense pursuant to section 207-c.  Tr.

110, 345, 569.  Those services are currently being provided through

Adams Apple Transport Services ("Adams Apple"), a medical

transportation provider.  Tr. 110, 345, 369.  In connection with that

transportation service plaintiff requested a "sit and spin" for use in

assisting him in entering and exiting the transport van; that device was

provided to him by the City.  Tr. 290-91.  The City has advised plaintiff that

it will pay for transportation costs necessary to transport him to and from

his medical providers as well as any medical appointments causally

related to his injuries.  Tr. 569.  The City has indicated, however, that it

will not pay for transportation unrelated to his work injuries, including for

visits to his attorney, the dentist, and an eye doctor.  Tr. 372, 569.

16

According to Michael Osterhout, the owner of Adams Apple, to his knowledge, the only two transportation bills not paid for by the City were for transports of Vassenelli to the dentist and to his eye doctor.  Tr. 372.

In addition to medical treatment, services, and devices, pursuant to section 207-c the City has paid for certain renovations to plaintiff's home. On January 11, 2011, a home health inspection was administered, at POMCO's request, by Tech Health, a company headquartered in Tampa, Florida.  Tr. 568; *see* Exh. P-I.  Renovations to plaintiff's home have included the voluntary installation of a chair lift along with a few other minor modifications.  Tr. 233, 568.  That lift was installed based upon Tech Health's recommendation following its home health inspection, and at the insistence of NurseCare, who refused to provide home health services for the plaintiff until a lift was installed.  Tr. 233, 323-24, 399, 401, 430, 506, 568; *see also* Exh. D-41.  Among the other recommendations made by Tech Health was a suggestion to address a step down into his living room through raising the living room floor.  *See Exh.* P-I; *see also* Tr. 246, 569.  Plaintiff, however, refused the City's alternative offer to install a ramp to correct the problem, and the City rejected the recommendation of raising the living room as not medically necessary.[10]

---

[10]      Tech Health also recommended a second ramp for emergency egress. Tr. 264, 292.  That recommendation was also denied as not medically necessary in

Tr. 569.

At various times, plaintiff has complained regarding the City's provision of care.  While a motorized wheelchair, also referred to as a scooter, has been prescribed for the plaintiff by Dr. Christenson, the City declined plaintiff's request to provide it after being advised by the doctor's office that it is not medically necessary for plaintiff to have one.  Tr. 206, 567, 593; *see also* Exh. D-7.  That request was denied for that reason and in light of the fact that plaintiff has been provided with a customized, non-motorized wheel chair, at an expense of $4,000, and has twenty-four hour home health aides who assist him in ambulating.  Tr. 205-06, 567-568; *see also* Exh. P-H.  During his testimony Dr. Christenson acknowledged that the motorized wheel chair is not medically necessary.  Tr. 219.

Plaintiff has also complained about the pivoting seat ("sit and spin") provided to assist him in entering and exiting his shower.  Tr. 48-49, 271.  In response, the City offered to install a larger "sit and spin" which would have required modification of plaintiff's shower.  Tr. 245.  Plaintiff objected, however, to the required modifications, and the larger device was therefore not installed.  Tr. 246.

---

view of the existence of a ramp into the garage to insure plaintiff's unfettered ability to enter and exit his residence and the fact that plaintiff receives twenty-four hour care. Tr. 293, 569.

In the opinion of Dr. Christenson, plaintiff's treating physician, Vassenelli is currently receiving appropriate care.  Tr. 222.  While in his motion plaintiff asserts that in 2009 the City altered its policy regarding payment for his care, the only denials of payment for specific treatment arguably occurring after 2009 are the discontinuance of plaintiff's massage therapy, denial of a motorized wheel chair, and denial of certain transportation expenses deemed not causally related and/or medically necessary to his work-related injury.

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on November 24, 2010, later amending and supplementing his complaint on September 29, 2011 to add additional claims and newly-named defendants.[11]  Dkt. Nos. 1, 45.   In plaintiff's current complaint he identifies as defendants the City of Syracuse; its current Mayor Stephanie Miner and former Mayor Matthew Driscoll; the current Syracuse City Police Chief, Frank L. Fowler and former Chief Gary Miguel; Syracuse Police Sergeant Richard Kevin Perrin; Judy Culeton, another employee of the Syracuse Police Department; POMCO and Sharon Miller, one of its employees; David

---

[11]     Both the City and POMCO defendants have moved for dismissal of all or portions of the claims set forth in plaintiff's amended and supplemental complaint. *See* Dkt. Nos. 58, 61.  Those motions are currently scheduled for argument before District Judge David N. Hurd on March 2, 2012.

Barrette and Sharon Eriksson, named as agents of the City but whose exact positions are unclear from plaintiff's complaint; and, additional unidentified "John and Jane Doe" defendants.  Dkt. No. 45.  Plaintiff's amended complaint asserts fourteen separate claims under both federal and state law and seeks a variety of relief, including compensatory damages in the amount of $40 million and an additional award of punitive damages, as well as permanent injunctive relief.[12]  *Id.*

On August 18, 2011, plaintiff submitted to the court a letter requesting that the court issue an order to show cause containing a temporary restraining order and seeking as the ultimate interim relief the entry of a preliminary injunction pending a final determination in the underlying action.  Dkt. No. 21.  In his motion, plaintiff requests an order 1) prohibiting the defendants from removing him from his home or ceasing to provide him with medical assistance; 2) requiring defendants to provide him with all medical treatment and services deemed necessary by

---

[12]     Plaintiff's amended and supplemental complaint demands an injunction,

restraining the Defendants from engaging in further violations of the Plaintiff's rights, including but not limited to, an Order precluding the City of Syracuse from further administering Plaintiff's health plan, any involvement in Plaintiff's medical treatment or care; or subjecting Plaintiff to any further medical examinations.

Amended and Supplemental Complaint (Dkt. No. 45) p. 18.

plaintiff's physicians and medical care providers; 3) prohibiting defendants from withholding funding for such services; and, 4) appointment of a special master to oversee plaintiff's medical treatment and payments to care providers.  *Id.*  Plaintiff's request for a temporary restraining order was denied on August 24, 2011, and his motion for a preliminary injunction was referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B).

An evidentiary hearing was conducted in connection with plaintiff's preliminary injunction motion over a three-day period, beginning on December 14, 2011.  Following the close of that hearing on December 16, 2011, at the request of the court, proposed findings of fact and conclusions of law were submitted by the parties on January 9, 2012.  Dkt. Nos. 100, 101, 102.   With the court's permission, the City has submitted a reply memorandum.  Dkt. No. 105. The matter is now fully briefed and ripe for determination.

III.    DISCUSSION

A.    Preliminary Injunction Standard

The standard a court must utilize in considering whether to grant a request for injunctive relief is well-settled in this circuit.  To warrant the issuance of a preliminary injunction, a movant must show establish 1)

irreparable harm and 2) either a) a likelihood of success on the merits or b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir. 2006) (citation omitted); *see also Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992); *Roucchio v. LeFevre*, 850 F. Supp. 143, 144 (N.D.N.Y. 1994) (McAvoy, C.J.).  An injunction is an extraordinary remedy, to be awarded only upon careful consideration of the competing interests of the parties presented in connection with an application for such relief.  *Winter v. Natural Res. Def. Council, Inc.*, 55 U.S. 7, 12, 129 S. Ct. 365, 376 (2008) (citation omitted).  "Moreover, when . . . the injunction sought is mandatory, rather than prohibitory, such that it will alter, rather than preserve, the status quo, the party seeking the injunction must make a 'clear' and 'substantial' showing of a likelihood of success."  *M.K.B. v. Eggleston*, 445 F. Supp. 2d 400, 426 (S.D.N.Y. 2006) (citing and quoting *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996)) (other citation omitted).

> B.    The Evidence in this Case

> 1.    Irreparable Harm

"Irreparable Harm is the single most important prerequisite for the issuance of a preliminary injunction."  *Rodriguez v. DeBuono*, 175 F.3d

227, 233-34 (2d Cir. 1999) (citation and internal quotation omitted).  The

Second Circuit has defined irreparable harm as damages that are certain

and imminent, as opposed to remote or speculative, that cannot be

remedied by an award of monetary damages.  *Wisdom Import Sales Co.,*

*L.L.C. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003).  To be

sure, "[t]he loss of medical benefits can constitute irreparable harm."

*Warren Pearl Constr. Corp. v. Guardian Life Ins. Co.*, No. 08 Civ.

9445(WHP), 2008 WL 5329962, at * 2 (S.D.N.Y. Dec. 9, 2008) (citing

*LaForest v. Former Clean Air Holding Co., Inc.*, 376 F.3d 48, 56 (2d Cir.

2004)).  A reduction in health insurance coverage may likewise suffice to

establish irreparable harm where the movant establishes  "(1) substantial

risk to [his or her] health; (2) severe financial hardship; (3) the inability to

purchase life's necessities; and, anxiety associated with uncertainty."

*LaForest*, 376 F.3d at 55.  Here, plaintiff's proof falls far short of these

standards.

   At the outset, the event that precipitated the instant application was

the City's alleged threat, over plaintiff's objection, to remove him from his

home and place Vassenelli in an assisted living facility.  The evidence

adduced at the hearing, however, demonstrated that the City never

intended or threatened to remove plaintiff from his home against his will.

Instead, as a result of an abrupt termination of the home health care services of NurseCore, the City found itself in a position of having to identify appropriate twenty-four hour care for plaintiff within one week. Anticipating the possibility that it might be unable to arrange for plaintiff's home care in such a short period of time, defendant Sharon Miller discussed with plaintiff the possibility of placing plaintiff in an assisted living facility on a temporary basis until home care could be arranged. The undisputed testimony at the hearing revealed that when plaintiff rejected this option, the City did not pursue the matter further, and failed to substantiate plaintiff's claim of a threat to remove him from his home notwithstanding.  Instead, to avoid an interruption of plaintiff's home health care, the City secured the services of an LPN, of whom plaintiff approved, to care for him on an interim basis; soon thereafter the City engaged Self-Direct, an agency chosen by plaintiff and whose services he is currently satisfied with, to assume the responsibility of plaintiff's home health care. Ultimately, plaintiff was not removed from his home, and there was no interruption of plaintiff's twenty-four hour health care.  In sum, the record is devoid of even a scintilla of evidence that there is, or ever was, any imminent threat that the City will remove plaintiff from his home.

Additionally, plaintiff has not shown that there is any imminent threat

24

that his section 207-c benefits will be terminated or reduced, or that there has been a termination or reduction in his benefits that has raised a serious threat to his health.  At most, the evidence demonstrates that a few items for which plaintiff has sought subsidy from the City pursuant to section 207-c have been declined, including the denial on one occasion of plaintiff's claim for a $45.00 reimbursement for services he could not identify and for which he did not have duplicate receipts,[13] the denial of plaintiff's request that the City provide him a motorized wheel chair even though he already has a non-motorized one, and the denial of continued payment for plaintiff's massage therapy.  With regard to the motorized wheel chair, plaintiff's treating physician, Dr. Christenson, testified that he issued a prescription for this device only at plaintiff's request and confirmed that it was not a medical necessity.  Tr.  206, 219.  Dr. Ward, who also treats plaintiff, similarly testified that the failure to provide plaintiff with the motorized wheel chair that he desires will not cause his condition to deteriorate.  Tr. 181.  Likewise, both physicians indicated that they could not state that the discontinuance of massage therapy would have a deleterious effect on plaintiff's condition.  Tr. 170, 218.  Furthermore, the record is clear that there has been no interruption in plaintiff's medical

---

[13]      The time frame for this disputed request for reimbursement is unclear.

treatment.  Tr. 230-232.

With regard to the hardship imposed upon plaintiff as a result of the City's conduct, plaintiff offered no evidence as to financial condition, or his inability to pay for the services and other things that he asserts are medically necessary.  There is nothing in the record to suggest that plaintiff is suffering severe financial hardship and is unable to purchase life's necessities as a result of the City's actions.  In fact, the evidence is undisputed that plaintiff receives disability retirement benefits and social security disability payments; plaintiff also maintains health insurance coverage through the City, but, without explanation, apparently has not sought payment of bills that have been rejected under section 207-c to his health insurance carrier.  In sum, there is no evidence, that the City's refusal to pay for some of the items that are disputed in this action has resulted in severe financial hardship to plaintiff, or left him without any coverage for his medical bills, in turn threatening his health.

To the extent that plaintiff claims that the City's refusal to provide certain transportation services or renovations to his home constitutes a reduction or denial of his section 207-c benefits, this claim similarly fails to find any support in the record.  There is simply no evidence that the fact the City would not reimburse Adams Apple for transporting plaintiff to his

dentist or eye doctor, or their failure to pay for renovations to his home, has had any negative impact on plaintiff's health.[14]

After careful review of all of the evidence in the record before the court, I conclude that plaintiff has failed to establish that there exists an imminent threat of irreparable harm warranting the issuance of a preliminary injunction.  *See Karen L. v. Heathnet of the Northeast*, 267 F. Supp. 2d 184, 191 ( D. Conn. 2003) (finding no irreparable harm with regard to plaintiffs' due process claims relating to alleged change in prescription drug benefits where there was no evidence that any Medicaid recipients were being denied access to needed medication or had been threatened with such).

### 2.   The Merits

Turning to the merits, plaintiff's complaint sets forth fifteen separate causes of action asserting claims under 42 U.S.C. § 1983[15] based upon

---

[14]    It is worth noting that section 207-c imposes liability upon the City for "all medical treatment and hospital care necessitated by reason of [plaintiff's work-related] injury or illness."  N.Y. Gen. Mun. Law § 207-c(1).  Plaintiff provides no authority for the proposition that this provision thus requires that the City pay for medical devices such as a motorized wheel chair, or transportation services, or, what seems even more dubious, home renovations.  Moreover, to the extent that plaintiff requires medical care not casually related to his workplace injury, as was previously noted, the plaintiff also maintains health insurance coverage that is separately made available to him by the City, an alternative of which he evidently has not availed himself.

[15]    Section 1983 provides, in relevant part,

Every person who, under color of any statute, ordinance, regulation,

alleged violations of his constitutional rights to due process and equal

protection,[16] deprivation of his Ninth Amendment rights,[17] and

conspiracy,[18] as well as state common law claims for breach of contract,

equitable estoppel, and negligence.[19]  All of these claims appear to be

----

custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  In order to state a claim pursuant to 42 U.S.C. § 1983, a plaintiff must allege that (1) the challenged conduct was attributable at least in part to a person or entity acting under color of state law and (2) such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir. 1993); *see also Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003) (quoting *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250 (1988)).

[16]    The evidence presented did not support plaintiff's assertion that he is being denied equal protection because he is being treated differently than firemen receiving section 207-a benefits.  To the contrary, the proof at the hearing was that the benefits to disabled City police officers and firemen are administered in the same way.

[17]    Because "[n]o independent constitutional protection is recognized which derives from the Ninth Amendment and which may support a § 1983 cause of action[,]" *Byng v. Campbell*, No. 907-cv-471, 2010 WL 681374, at * 18 (N.D.N.Y. Feb. 24, 2010) (Sharpe, J. and Homer, M.J.) (citing *Rini v. Zwirn*, 886 F. Supp. 270, 289-90 (E.D.N.Y.1995)), it appears that plaintiff's fifth cause of action, which is premised upon an alleged violation of the Ninth Amendment, is destined to fail.

[18]    To sustain a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that a defendant "acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, that violated the plaintiff's rights . . . secured by the Constitution or the federal courts." *Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995) (citations and internal quotation marks omitted).  Plaintiff failed to produce any evidence of an agreement to violate his rights at the preliminary injunction hearing.

[19]    In his thirteenth and fourteenth causes of action, respectively, it appears that plaintiff may also be asserting claims for violation of the Americans With Disabilities Acts, 42 U.S.C. § 12101, *et seq.*, and under section 1983 for retaliation in

premised upon the City's alleged 2009 change in policy with respect to the payment of 207-c benefits, which plaintiff claims resulted in the termination or reduction of his benefits.

Section 207-c was enacted to provide disability benefits to police officers injured in the line of duty. *DePaolo v. Cty. Schenectady*, 85 N.Y.2d 527, 532-33, 650 N.E.2d 395 (1995). The New York Court of Appeals has held that "[t]he plain wording and legislative history of General Muncipal Law § 207-c notably authorize the municipality itself . . . to make the determination whether the injury or illness is related to work performance in the line of duty." *Balcerak v. Ctny. of Nassau*, 94 N.Y.2d 253, 261, 723 N.E.2d 555 (1999) (citing cases). The statute has been interpreted by that court to permit the municipality, and not the injured officer, to make the determination as to whether an injury or illness is work-related. *DePaolo*, 85 N.Y.2d at 532-33, 650 N.E.2d 395. In so holding, the Court of Appeals emphasized that when section 207-c was enacted

> [c]oncerns over the potential abuse of municipal resources created by some police officers receiving dual benefits (i.e., collecting full salaries as policemen under this statute while simultaneously employed on a full-time basis in private industry) or partially disabled officers capable of performing

---

violation of his First Amendment rights.

> light duty or retiring fully due to disability, collecting full
> benefits under . . . § 207-c, as was experienced under General
> Municipal Law § 207-a with some firemen, were arguments
> advanced by those opposed to the enactment of . . . § 207-c
> and to the provision of similar benefits to police officers.

*Id.* at 533.  In light of the legislative history, that court instructed that

section 207-c "should be construed to protect municipalities from

fraudulent or unworthy claims."  *Id.*

At the same time, it is a well-established principle that section 207-c

gives rise to a property interest, which cannot be denied without due

process of law.  *See De Masi*, 567 F. Supp. 2d at 454 n.3 (citing *Gamma*

*v. Bloom*, 274 A.D.2d 14, 16, 711 N.Y.S.2d 464 (2d Dep't 2000); *Uniform*

*Firefighters of Cohoes, Local 2562, IAFF, AFL-CIO v. City of Cohoes*, 94

N.Y.2d 686, 691, 731 N.E.2d 137 (2000)); *see also Chernoff v. City of*

*New York*, No. 06-CV-2897, 2009 WL 816474, at *3 (E.D.N.Y. Mar. 26,

2009) (citing *Otero v. Bridgeport Hous. Auth.*, 297 F.3d 142, 151 (2d Cir.

2002)).  Courts have concluded that when a termination of section 207-c

benefits occurs as result of a determination made by a government actor

pursuant to an established policy, some minimal pre-termination

proceeding is required.  *Mullen v. City of Syracuse*, No. 5:10-CV-1110,

2011 WL 111872, at *3 (N.D.N.Y. Jan. 13, 2011) (Hurd, J.) (quoting

*DeMasi*, 567 F. Supp. 2d at 455).

Plaintiff's claims are grounded upon his contention that a new policy instituted by the City in September 2009 limited the medical benefits available to him and effectively prevented his access to the ongoing medical care he requires by applying the worker's compensation schedule to his medical expenses and that he did not receive notice or an opportunity to be heard before this policy took effect.[20]   Contrary to

---

[20]   Plaintiff also takes issue with the City's "management" of his 207-c related health care, including efforts to contact his treating physicians directly, as well as the city's occasional requirement that he submit to an IME in order to determine if a specific treatment is causally related and medically necessary.  Section 207-c requires that the municipality, rather than the injured police officer, directly pay providers for services.  *Gentile*, 146 F. Supp. 2d at 343.  This section also precludes medical providers from seeking payment directly from the injured police officer.  *See* N.Y. Gen. Mun. Law § 207-c(1).  As a result, where, as here, the City is self-insured and the extent of plaintiff's injuries require not only an array of medical services, but twenty-four hour care, it seems unavoidable that the City be involved to some extent in the management the plaintiff's medical care provided under section 207-c and that it maintain contact with plaintiff's medical providers for the purposes of determining the relation of the treatment to the workplace injury and its necessity, as well as payment of bills.

With respect to the IME requirement, I note that section 207-c renders the municipality liable only for "causally related medical bills" which are necessitated by reason of the work-related injury.  *Gentile*, 146 F. Supp. 2d at 348 (citing *Schneider v. Lando*, 113 Misc. 2d 112, 450 N.Y.S.2d 1017, 1017-18 (N.Y. App. Term 1982)).  While there seems to be a lack of case law addressing the particular issue of how the determination as to payment of discrete bills for medical treatment or services is to be made by a municipality, as plaintiff concedes, it is well established that "section 207-c clearly authorizes municipality to require an independent medical examination prior to a determination of eligibility. . .."  *DePaolo*, 85 N.Y.2d at 533, 650 N.E.2d 395.  Keeping in mind that section 207-c must be interpreted so as to allow municipalities to protect against fraud, as the New York Court of Appeals's instructed *DePaolo*, it seems logical to conclude that in order to protect itself from paying for medical care that is not medically necessary as a result of an officer's work-related injury, a municipality is authorized to conduct such exams as needed in order to make decisions as to the necessity of particular treatments or services.  Plaintiff has cited no authority to the contrary.

plaintiff's underlying assertion, the unrefuted evidence adduced at the hearing shows that it has been the City's long-standing policy to utilize the workers' compensation scheduled rates as a guide for payment of 207-c benefits.  Plaintiff proffered no evidence of any other alleged change in policy.

In addition, plaintiff offered no evidence that any medical provider has refused to treat him as a result of the City's payment in accordance with workers' compensation rates.  To the contrary, the only evidence offered by plaintiff in this regard was of an inquiry from MedBest Medical Management in October 2011 that was clearly prompted by plaintiff's counsel's suggestion to that entity that it is unlawful for the City to pay plaintiff's medical bills at the workers' compensation rates.

The evidence further established that the City's policy of using IMEs to assist it in determining whether a particular treatment requested is causally related to the work-related disability was not newly instituted in 2009, but was applied to plaintiff in conformance with a practice that had existed for many years prior.  Indeed, plaintiff failed to come forward with any evidence even suggesting that the City adopted any wholesale change in its policy effecting a termination or reduction in the payment of plaintiff's section 207-c benefits.

Upon careful consideration of the evidence in the record before the court, I conclude that it is unlikely plaintiff will prevail on, nor has he raised sufficiently serious questions regarding the merits of his claims.

III.   <u>SUMMARY AND RECOMMENDATION</u>

At the first prong of the governing preliminary injunction standard, I find that the plaintiff has failed to establish that he is being denied coverage under section 207-c for medical care necessitated by his injuries, and has failed to demonstrate there is any imminent threat that he will be removed from his home or that his health is otherwise in serious jeopardy.  As a result, plaintiff cannot demonstrate the existence of irreparable harm in the event that preliminary injunctive relief is not entered, and, for this reason alone, denial of his application is warranted.

Turning to the second prong of the prevailing standard, I find that the evidence adduced at the recent hearing did not bear out plaintiff's claim that in or about September 2009 the City instituted a change in policy in administering section 207-c benefits without providing plaintiff with notice and an opportunity to be heard.  Accordingly, plaintiff has not demonstrated a deprivation of a property interest, or any other right, and has not shown a likelihood of success on the merits of his claims.  The most plaintiff has established is that he disagrees with the City over

33

whether certain expenses, including predominantly massage therapy, some transportation expenses, and a motorized wheel chair in addition to the customized one that he has been provided, fall within the ambit of section 207-c as medically necessary and causally related to his injuries. Unfortunately, this court neither has jurisdiction, nor is it well-equipped, to determine on an expense-by-expense basis whether plaintiff is entitled to reimbursement for those and any other expenses sought under section 207-c.

Accordingly, it is hereby

RECOMMENDED that plaintiff's motion for a preliminary injunction (Dkt. No. 21) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within FOURTEEN days.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1);  FED. R. CIV. P.  6(a), 6(e), and 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

34

Dated:      January 30, 2012
                Syracuse, NY

David E. Peebles
U.S. Magistrate Judge